And we'll next hear argument in the case of United States v. James David Allen, II. Good afternoon, Your Honors, and may it please the Court. My name is Lisa Moth, and I represent Defendant Appellant James David Allen, II. I would like to observe, with the Court's permission, five minutes for rebuttal. Okay, please watch the clock. Mr. Allen has raised five issues on appeal for miscondiction in sentence for being a felon in possession in violation of 18 U.S.C. 922g. For this argument, I would like to focus on the Fourth Amendment issue, which is the first issue in the party's briefs. I am, however, available to answer any questions the Court may have on any of the other issues. The Fourth Amendment's warrant requirement is clear on what officers should have done after they arrested and secured Mr. Allen and had that, quote, gun feeling and wanted to search the vehicle, quote, real good. The Fourth Amendment's warrant requirement in its text requires that the officers get a warrant, and there's no reasons officers could not have done so in this case. Judges, however, have carved many exceptions to the Fourth Amendment's warrant requirement, and it is these judge-made exceptions that are at issue in this case. I'll start with the inventory search exception. This is the only exception that the government properly raised in the District Court. The District Court found that the officer's subjective motivations in this case were investigatory. In the first volume of the case, there was absolutely no question that officers expected and even hoped to find evidence of a crime if they searched the Corolla. Does it matter if they had a subjective motive as long to search as long as they also had a motive to conduct an inventory search? In this case, it would matter if the officers also had a motive to conduct an inventory search, but importantly, the District Court never found that their subjective motive was to conduct an inventory search. So, haven't we said that the test is whether the officers were objectively justifying performing an inventory search? That is the standard if there's a dual motive. In other words, if the District Court had found that the officers had a subjective administrative or community caretaking motive, this Court in Garay and in Magdalena has said that mere non-compliance with an inventory policy is not dispositive, and officers, if they did have some sort of administrative purpose, would have been objectively justified in conducting an inventory search. So, the car was stolen, the owner was in Washington, the car had to be towed, and they had a policy for connecting requiring them to take an inventory in that situation, and they even filled out the form for the inventory. So, why doesn't that show an objective? They were objectively justified in performing an inventory search, which is what the is not dispositive in this case because the District Court never made a finding that they had a subjective community caretaking reason for performing the search. Is that a requirement? It is, Your Honor. They were objectively justified and they said they were doing it for inventory purposes. Is it required that they have a subjective motive as long as there is objective evidence and that's what they were doing it for? Yes, Your Honor. It is required that the officers not have, as their sole subjective purpose, the purpose of investigation. In Opperman and Bertine, the Supreme Court has held that if an inventory search is invalid, if it is for the sole purpose of investigation. Here, the only purpose that the District Court found was investigatory and never found a dual motive or administrative purpose. Similarly, in Johnston, which is, as we've said in our briefs, the most similar case to this case. Excuse me one second. Where do we find that in the record? The fact that the District Court made a determination that this was for investigative purposes and made no determination that it was for inventory purposes? Where in the record do we find that determination? It's in the records at Volume 1, Excerpt of Record 108. There, the District Court said there's absolutely no question that the officers expected and even hoped to find evidence for crime. And it specifically did not find a subjective administrative or community care taking purpose. It said only that, quote, it is also clear that officers were objectively justified in performing inventory search. And this objective justification is not sufficient under this court's case in Johnston. I don't think that that demonstrates what you claim it demonstrates. That is, that the inventory search was not a probable objective basis for conducting the search. What exactly is your argument? Now I'm a little confused. Is your argument that they had to, because it seems to me the District Court does say they were objectively justified, so that sounded to me like that they had an objective basis to do an inventory search. But is your argument that they also had to be subjectively want to do it for inventory purposes? Yes, Your Honor. In Bertine and Opperman, the Supreme Court specifically found that there was no evidence that there was, that the officers acted for, quote, the sole purpose of investigation. Here, however, there's no finding as to the subjective purpose that was administrative. So in Majula, for instance, the District Court specifically found that the officers had an administrative purpose. And in Gray... Are you saying that unless a District Court makes a finding that they had a subjective intent to inventory, it's not enough to say they were justified to doing an inventory search? Is that your position? That's the court's holding in Johnson. In Johnson, the District Court never made any finding regarding motive. And it simply found, similar to what the District Court in this case, it simply found that the policy mandates officers to conduct an inventory of impounded vehicles. Similarly, in this case, the District Court simply relied on this objective justification, the inventory policy, but it did not make a finding about a subjective purpose to conduct an administrative or community caretaking search or inventory. Wouldn't the objective override the subjective? I just don't follow the argument. If I had an objective purpose that is a specific purpose to set out to conduct an inventory search, you're saying that if I didn't have a subjective purpose to do so, that would not be a valid search. I don't understand the rationale or the logic of that argument. I think my argument is that in a case of a dual motive, so where the District Court found both that the officers had a mixture of a subjective investigatory motive and some motive to conduct community caretaking or administrative inventory, then the court is correct that the burden is on us to show that the officers would not have acted the same regardless of their motivations. But the Supreme Court has held, and this court has held in Orozco and Johnson, that where the only purpose is investigatory, then that invalidates an inventory search. And the reasoning for this is that the court then cannot determine whether or not the search would have been conducted according to the inventory policy if the only motivation was subjectively investigatory. So in this case, for example, nothing in the policy requires that the officers read the serial number of the rifle to the dispatcher. Nothing in the inventory requires that they seize the assault rifle and the ammunition. And indeed, in this case, the officers left similar contraband, like knives and marijuana, in the vehicle. Is this your strongest argument? I'm sorry. No, that's all right. I'm just asking for some evaluation. Go ahead, Judge Becerra. I'm sorry, Justice Kuda. No, I defer to the presiding judge, of course. I was asking a related question. The government also argues that Mr. Allen lacks standing to challenge the search because the Corolla was a stolen vehicle and that the government can raise a standing issue of that sort for the first time on appeal under Reyes-Foskey. Could you address that issue? Yes, Your Honor. As we stated in our briefs, under Reyes-Foskey, the government can raise a standing issue on appeal if, however, it does not rely on facts suggesting otherwise, or in other words, supporting the defendant's standing. In this case, the government specifically relied on facts at trial that would suggest a reasonable expectation on privacy. Specifically, the fact to the jury that you saw that the defendant was the sole occupant of the vehicle and you saw that he had keys to the vehicle. Both the fact that Mr. Allen had keys to the vehicle and that he was the sole occupant suggest that he had a reasonable expectation of privacy. The government, in relying on those facts in the trial, have not met their burden in Reyes-Foskey to prevent the court from ruling that a waiver occurred with respect to the issue of standing in this case. Did you want to save the rest of your time for rebuttal? Yes, I do, Your Honor. Thank you. Okay, then we'll hear from the government. Good afternoon, Your Honors, and may it please the court. My name is Noah Stern and I'm representing the United States. The court should affirm Allen's conviction in this case because the district court correctly concluded that the search of the stolen vehicle that Allen occupied was a bona fide inventory search and there are multiple other bases in the record to support the affirming the denial of the motion to dismiss. Before we discuss the Fourth Amendment, could I ask you about the public trial right issue? I think the parties had said it was a partial closure, but wasn't a total closure all persons other than the witnesses, court personnel, parties, and lawyer were excluded for the duration of the hearing. Under U.S. v. Rivera, doesn't that make it a total closure? Your Honor, I don't think it was a total closure because the public retained audio access to what occurred in the courtroom. So while it's true that the public did not have access to attend the courthouse itself, everything that transpired or the audio of that was provided. So it was a partial closure in the sense that the public couldn't see what was going on. There's no case that holds that right? We found no case holding that. This is just your suggestion, right? That's correct, Your Honor. I think that in any event, I think the circumstances here would have justified a total closure, given the court's compelling interest in the safety of the participants of the trial and the public and preventing the spread of a death penalty. Haven't all the other district courts either allowed some people inside or allowed people to watch it on video access within the courtroom? There doesn't seem to be any cases where only audio, which is obviously not the same as public observation of a trial, was in place. Your Honor, I think many of the cases I've seen have provided for some sort of visual access, but I don't think that sort of access is constitutionally required. I think the question is whether the court excluded spectators only to the extent necessary. It wasn't necessary. We know it wasn't necessary because other district courts were able to provide video access or even allow some limited number of people into the courtroom, right? Well, I think the context matters here. The court was balancing these very serious issues as it was trying to provide Mr. Allen a speedy trial during the pandemic. This happened at a time when the courts had addressed the issue, and this case proceeded much more quickly than some of these other cases. In balancing those very serious interests, I think the court had very good reasons, and it stated those reasons on the record at excerpts of records 66 through 69. But would a transcript have been enough? I mean, the court in Waller seemed to think that a transcript wouldn't have been enough. It was not really a fact. I think in your brief, you said that an audio recording is like a transcript. Well, I think an audio recording bears some similarities to a transcript, but at the same time, it is different in the sense that the public and the news media has live access to everything that's being said in the courtroom. And ultimately, I think what's at issue here are the purposes that are furthered by the Speedy Trial Act, but by the Sixth Amendment Public Trial right, which is to ensure a fair trial. The public is barred. Nobody can see what's happening. No one can observe the expressions on people's faces. I think the court actually here made the jurors wear clear masks so that people could see their faces, but the public wasn't able to see it. Were they? No, Your Honor. The public was not able to see it. I would note that the general order from the district court allowed individuals who were permitted to attend proceedings to attend. So I think that left open the possibility of requesting access for individuals requesting access and allowing the court to address that. That wasn't something that occurred here. Mr. Allen never requested that anyone be able to attend. No one from the public ever requested, at least nothing that's clear from the record. And so it's not really clear that- Is it okay to close a courtroom if nobody requests access? Is it okay to bar the public if nobody requests? Does there have to be some specific requests? Well, Your Honor, I think here, I mean, the courtroom was not closed in the sense that everything that was happening inside of it could have been heard from anywhere in the country. And I think it's also important to recognize that these were not proceedings where the prosecutor and the judge and the defendant were acting in the dark. This was a full courtroom with all of the participants. The eyes of the jury were on the prosecutor. All of the participants except the public, which is required by the constitution. Isn't that correct? Well, Your Honor, I think to the extent that providing audio or video is not- Well, video was not provided. That's undisputed. All you had was an audio recording, so you couldn't see what was going on. Well, but I think you have to credit that audio though, because if you're not, then ultimately the question is, did the court have the justification to close the courtroom entirely with respect to the type of access that has traditionally been required by the courts, which is that people can attend in person. There's never been a right to video access. There's never been a right to audio streaming. And in fact, Rule 53 explicitly prohibits the broadcasting of proceedings from the courtroom. So I think it has to be considered in that context. And here, the court thoughtfully addressed all of these issues and decided that there were very good reasons for not providing video access here, which was consistent with Rule 53, and which was also consistent with the court experiencing in one of the civil proceedings before it, that images had actually been taken and rebroadcast. So did the court allow in a large veneer to be chosen? So it clearly wasn't. It was, I think there were 60 or over 60 people who were allowed in for the veneer. No, your honor, the court did the veneer in groups, I believe groups of 20. So there were other people, were they in other rooms in the courthouse? There were, the court conducted three separate veneers. So it was a group of 20, and then the next group of 20 came in and the next group of 20 came in. So someone could have been allowed to participate. The court found that it was consistent with safety and a fair trial to have 20 people in the courtroom for veneering. Well, your honor, I don't know that there were, I don't know that there were significantly fewer people in the courtroom during the actual trial. I mean, this isn't in the, this may be in the record somewhere, but the jurors were spread out through the gallery. Essentially the entire courtroom was filled to allow for social distancing. I think you may be correct that if Mr. Allen had requested, for example, his mother attend, that potentially the court could allow room for that. But it wasn't faced with such a request. There wasn't ever any specific individual who wanted to attend who was excluded, which is one of the things that have occurred in any of the cases, in those other cases. And I think it's also important to point out that none of the cases that that Allen has cited require this sort of video access. And the thing that the common thread, public trial. Well, but I think the common thread is narrow, is narrowly tailored. But let me, I've probably taken you too much time on the public trial, right? So I'll let you get onto another issue if you like. Thank you, Your Honor. I'll try, I'll turn briefly to the inventory search. I think Your Honor is correct that the ultimate standard that applies is, would this search have occurred in the absence of the investigatory motive? And the district court was not required to find subjective motives. And I think this is clear from the standard that the court stated in Johnson, Magdarella, and Garay, where in Johnson, the court stated that if there is the presence of an investigatory motive, or a dual motive, suggesting that an investigatory motive alone, the critical question is would have occurred anyways. And I think that the reason why the court does that is because that's one way of assessing whether the sole reason for the search was investigatory. And I'd also point the court to the language in Bauhey, where the court said where the conduct would have been the same regardless of the officer's subjective state of mind, no purpose is served by attempting to tease out the officer's true state of mind. But even if the court were required to find dual motivations, dual subjective motivations on behalf of the officers, I think the court functionally did that. First, it rejected the argument. It explicitly rejected the argument asserted by Mr. Allen that the only motivation of the officers was investigatory. That's at from Magdarella, where this court in that case had said that where the officer decides to impound the car prior to searching it and finding contraband in it, that strongly suggests or that suggests that the motivation was administrative. And the district court actually quoted that So I think it actually did functionally find dual motivations. So counsel, it doesn't seem to me, it seems to me precedent forecloses a subjective analysis because precedent does, as you say, it requires us to consider whether the search would have the search would have happened anyway, right? So that can't be a subjective. I don't see how that turns on a subjective thing. So on one end of the spectrum, I don't think it matters subjectively on the, you know, whether the what the officer's subjective motives were. On the other end, I could imagine a standard that said if the search could have, not would have, but the search could have happened for a permissible reason, that is an inventory search, then it doesn't matter, right? And so that could be the standard, but that and that it doesn't seem to be that standard either, right? The standard doesn't seem to be whether it could have happened. Instead, the standard seems to be kind of in the middle somewhere where it's would it have happened anyway? Like in other words, would would they have done the search for an inventory purposes? And what is there, what evidence in the record is there that they would have done the inventory search regardless? Your Honor, I think one of the most important pieces of evidence in the record is that the dispatch for a stolen vehicle recovery that's at Exerts of Record 225 and 369. Right off the bat, this is the type of call that is likely to result in the impound of that vehicle. When the officers got to the scene, they confirmed that the vehicle that Allen was in was reported stolen. That's at Exerts of Record 293, 350 to 351. They knew that that vehicle had been stolen out of Washington or been reported stolen out of Washington and was registered out of Washington. So they didn't believe that the owner could come and take the vehicle from the scene. And then therefore, pursuant to policy and pursuant to their practice, they were required to impound that vehicle for safekeeping. Remind me again, in the Johnson case, there was also a policy that would have applied, but the court sort of disregarded that policy in Well, I think the facts in Johnson are completely in opposite. And one of the reasons for that is that in Johnson, the officers were investigating a specific individual who had an arrest warrant and had multiple opportunities to arrest that individual, but didn't and only did so by boxing his car in a way that required the impound of the vehicle. But I think the other important point about Johnson is that the officers there seized numerous items as evidence that were not on their contraband. So for example, they seized some bags, but not all of the bags. They seized a flashlight, a jacket, and two cell phones. And the government sought to justify all of those seizures pursuant to the inventory search doctrine. This court found that the only reason that they could have seized those items or the only reason they did seize those items was for purposes of evidence of a crime found in the vehicle during an inventory search, but they hadn't done so here. Here, the officers had a clear justification for seizing the evidence once they found it, both pursuant to the community caretaking doctrine because it was on its face a dangerous gun that they wouldn't have wanted to leave in the vehicle. And secondly, because there was probable cause that it was evidence of crime. In California, it's illegal to possess a concealed weapon in a vehicle. It's illegal to possess a loaded weapon in a vehicle. And the officer testified to this at excerpts of Record 379. So they had a justification to seize those items. I see that I'm out of time. So unless the court has additional questions for me, I will rest on my brief and I would ask the court to affirm Allen's conviction. Thank you. And you have some time for rebuttal. I'll start with the court's question about whether the officer's actions within the inventory policy are the same regardless of their investigatory motive. The government cites to the inventory policy and talks about seizing the officer's decision to seize the assault rifle because it was illegal to possess that in this state. However, there's nothing in the inventory policy that states that the officers must seize any contraband. And that's at supplemental excerpts of Record 205, which describes the inventory policy. And in this case, the officers did not, in fact, seize all of the contraband. As the court, the district court found at Volume 1 excerpts of Record 110, there were four cell phones, one tablet, two knives and marijuana that was not seized. And so the question of whether the officers would have seized the assault rifle when it did not seize the two knives and the marijuana. So I hear your argument on that. The only thing it just seems if if if they go and the vehicle is actually stolen and I don't think you dispute that the vehicle is actually stolen. So regardless of what happens, that vehicle is going to be towed. First question, I guess, is do you agree that that if it was going to be towed, that they were more likely than not going to actually search it before they towed it pursuant to their policy? Or we there's evidence in the record that they ignored their policy in significant respects and there's evidence that they would have ignored it. I want to ask a specific question just to be clear. I understand that you're saying they ignored their policy in the sense that there was some stuff that they didn't inventory. But I mean, this is sort of the bigger picture, which is do you think they would have just towed a vehicle without inventorying at all and in sort of against what their policy required? Because that's kind of important. Because if they were going to do that, then it's hard to imagine that they wouldn't have found a firearm. Right. And then once they found the firearm, if I understand correctly, it sounds like you're saying, well, they might have just left it sitting there. But that's like not going to happen. Right. I mean, that doesn't that's not really plausible. So you see what I'm saying? Like it all kind of comes down to whether or not it seems to me and tell me if I'm wrong, but it seems it comes down to actually going to search it pursuant to an inventory if they tow it. And I can't tell whether you're saying that wouldn't happen at all. I'm saying that the thoroughness of the search and the seizures may not have been the same. So, for example, in this case, there's evidence that the officers were not thorough on their search. In this case, they allegedly recovered the rifle under a jacket in the passenger side seat. But at trials later revealed that this was actually a reenactment that the officer's body cam had been turned off for less than a minute, but that the he actually reenacted discovering the rifle in the area that he stated it was and that the body cam showed it was and that's at volume five. If I may, I would like to make one last futile effort to ask you to please address the public trial aspect of your case. Yes, Your Honor, as a public access, you never you never addressed it in your first argument. And here you have 42 seconds and the public access record issue is largely controlled by Riviera, as you pointed out. And as Your Honor pointed out, other districts during this time did permit video streaming. And we've submitted a district Rhode Island order that showed that they permitted video streaming and that they simply entered an order stating that the public should not record. And there was no showing as to why that wasn't sufficient in this case. If there had been video recording, would that satisfy your objection? I think it would if there was also some consideration of what sort of public access would have been available. As the court noted, the veneer was permitted in as many as 20 people. At the trial, there was social distancing as the prosecutor notes. Thank you. I think your time is up, but I don't want to be the guy who asked you to go over. Right. Well, we thank both sides for the argument in this interesting case. And the case of United States versus James David Allen II is submitted.
judges: Lucero, IKUTA, VANDYKE